IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

**Alexandria Division**

| | | |
|---|---|---|
| **Richard Allen Patterson,** | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **1:20cv202 (AJT/MSN)** |
| | ) | |
| **William C. Smith, et al.,** | ) | |
| **Defendants.** | ) | |

MEMORANDUM OPINION

Proceeding pro se, Virginia inmate Richard Allen Patterson initiated this civil-rights

action pursuant to 42 U.S.C. § 1983, alleging in his amended complaint that Western Tidewater

Regional Jail ("WTRJ") officials Doris Jacobs and Ernest Bower denied him hearing aids after

an audiologist recommended them in January 2020 [Dkt. No. 10 at 6-12], and that defendant

Bower failed to protect him while in WTRJ's custody, which resulted in an assault by another

inmate on March 10, 2019. [Id. at 12-13]. The defendants have filed a motion for summary

judgment, with a supporting brief and exhibits. [Dkt. Nos. 35, 37]. Patterson has been afforded

the opportunity to file responsive materials pursuant to Roseboro v. Garrison, 528 F.2d 309 (4th

Cir. 1975) and has done so. [Dkt. No. 39]. Accordingly, this matter is now ripe for disposition.

For the reasons that follow, the defendants' Motion for Summary Judgment shall be granted in

part and denied in part.

**I. Facts**

Richard Allen Patterson ("Patterson") is a federal inmate, convicted and sentenced to a

term of imprisonment within the Bureau of Prisons. Patterson was transferred to the WTRJ on

January 20, 2019, from the Federal Correction Institute in Petersburg, Virginia, on his own

request. Patterson requested this transfer under the Interstate Agreement on Detainers because

he had a probation violation matter pending in a local Virginia jurisdiction he sought to resolve. [Dkt. No. 37-1 at 1]. Defendant Ernest Bower ("Bower") is a Lieutenant Colonel and the Deputy Superintendent at WTRJ. Defendant Doris Jacobs ("Jacobs") was the Health Services Administrator at WTRJ.

### A. Claim One, Deliberate Indifference (Denial of Hearing Aids)

On March 10, 2019, Patterson was assaulted by another inmate, Shane Cottrell, who slammed plaintiff's head into a concrete floor. After the assault, Patterson was taken to the WTRJ medical unit where he complained of fluid "leaking from both ears, extreme headache and blurred vision" and that his "ears were extremely painful too." [Dkt. No. 37-13 at 24]. Patterson alleges that he was taken to the hospital and diagnosed with hearing loss, swelling, ringing in his ears, a cut lip, and a dislocated finger. On March 11, 2019, Patterson complained to the medical unit at WTRJ about his ears and was assessed by a nurse. [Id.].

Medical records, though, indicate Patterson did not complain about hearing loss when he was examined after the assault. [Dkt. No. 37-14 at 1-14]. Patterson's records establish that, after the attack, he had facial lacerations, a dislocated finger, and left leg pain, and that he was alert and oriented with regard to persons, place, time, and events. [Id. at 2]. The only tests performed at the hospital reflected in the hospital records were x-rays of Patterson's left knee, left foot, and right hand. [Id. at 6-7; 37-15 at 55-56]. Patterson's medical history stated he suffered prior head trauma on June 6, 2012. [Dkt. No. 37-15 at 56].

On March 20, 2019, Jacobs received a request for medical care from Patterson and informed him that he would be placed on the list to see Dr. Taylor. Patterson saw Dr. Taylor the next day, at which point Dr. Taylor gave Patterson medication for his complaints. Dr. Taylor diagnosed Patterson as having "barotrauma with recent perforation of TMs" and directed

Patterson to continue ear drops as ordered and to "complete Tramadol dosing." [Dkt. No. 37-8 at 8].[1] An examination by the audiologist on January 13 and 23, 2020 concluded the tympanic membranes were "intact." [Dkt. No. 37-8 at 90, 92].

On April 1, 2019, Jacobs received a request from plaintiff to see an audiologist. She informed Patterson that he would need to be assessed by Dr. Taylor, as Dr. Taylor was the only official authorized to make referrals. On April 4, 2019, Dr. Taylor saw Patterson, who complained of decreased hearing. Dr. Taylor noted, however, that Patterson was able to hear from both sides at a conversational tone without any difficulties. [Dkt. No. 37-8 at 7, 8]. Rather than refer plaintiff to an audiologist, Dr. Taylor determined that Patterson would be followed "clinically." [Id.]. Patterson alleges Dr. Taylor diagnosed him with "traumatic barotrauma (ear drum rupture)" and told Patterson he would be referred to a "hearing specialist and audiologist."

Patterson was seen by medical personnel on at least six occasions after the April 4, 2019 assessment by Dr. Taylor: on April 10, 2019, April 30, 2019, May 2, 2019, May 10, 2019, June 3, 2019, and September 18, 2019. The records of those six doctor visits do not include complaints about hearing loss. Patterson

- complained about his finger on April 10, 2019;
- complained about a spider bite on April 30, 2019;
- complained about his right shoulder on May 2, 2019;
- complained about another spider bite, an abscess on his upper right arm, his left upper arm, and he needed dressings changed on May 10, 2019;
- requested an inhaler to help with his breathing, wheezing on June 3, 2019; and

---

[1] "[B]arotrauma is ear pain or damage to the tympanic membrane caused by rapid changes in pressure." Merck Manual, Ear, Nose, and Throat Disorders/Middle Ear and Tympanic Membrane Disorders/Otic Barotrauma, https://www.merckmanuals.com/professional/ear,-nose,-and-throat-disorders/middle-ear-and-tympanic-membrane-disorders/otic-barotrauma (last viewed Nov. 23, 2020).

- complained about back and leg pain, and weight gain on September 18, 2019.

[Id. at 5-7]. In his response to the motion for summary judgment, Patterson asserts that he complained to the medical department about ear pain on May 2, 2020, August 10, 2020, August 24, 2020 and October 8, 2020. [Dkt. No. 39 at 3]. For purposes of this Motion, the Court will assume that Patterson complained in tablet messages about ear pain on those four dates.[2]

On October 7, 2019, Patterson submitted a medical request to see an audiologist for his hearing loss. On October 19, 2019, Dr. Taylor saw Patterson, noted he was complaining about hearing loss, and referred him to an audiologist. [Id. at 4]. On November 25, 2019, Patterson was seen by the audiologist. [Id. at 120].

The audiologist saw Patterson three times: on November 25, 2019, January 13, 2020, and January 23, 2020. [Id. at 81, 101, 118]. Following the November 25, 2019 visit, Dr. Taylor sent Patterson for an MRI, which was performed on December 26, 2019. [Id. at 95-96, 115]. The audiologist notes of the visits indicate that while the March 2019 fight could not "be ruled out as a contributing factor," Patterson had admitted to a history of recreational (firearms) and occupational noise exposure (helicopter pilot) which can also be contributing factors to his hearing loss, especially with the left worse than right." [Id. at 81, 85, 120]. The medical records

---

[2] Patterson has requested a subpoena for all of his tablet messages, asserting that the defendants have sanitized some of his tablet messages and have omitted some altogether. He cited the above four dates in response in support of his assertion. Patterson's response also cites the July 7, 2019 tablet message in defendants' exhibits claiming it states, "extreme ear pain, inability to hear, swollen (ear drums) need antibiotics." [Dkt. No. 39 at 3]. The other two tablet messages dated May 29, 2019 and May 28, 2019 he references in his response are requests to speak with Jacobs, but the messages do not reference hearing loss or ear problems. Patterson stated in his response that he copied all the relevant tablet messages before he was transferred from WTRJ. [Id. at 4]. In a subsequent response, Patterson states he only copied "dates." [Dkt. No. 42 at 1]. The Court assumes that Patterson complained via tablet messages about ear pain on those four dates and therefore there is no need to issue a subpoena in this matter.

indicate Patterson complained of ear pain during the November 25, 2019 examination by the audiologist but not during the January 13 or 23, 2020 examinations. [Id. at 88, 102, 120]. The tests performed on November 25, 2019 determined Patterson's hearing loss was "[n]ormal to moderate [in his] right ear and normal to severe" in his left ear. [Id. at 84]. The audiologist also noted that Patterson's "Speech Reception Thresholds [were] Normal bilaterally" and that his "Speech Discrimination [was] Excellent bilaterally," and he had clear speech. The January 13 and 23, 2020 notes indicate Patterson had "[n]o impairment in communication." [Id. at 84, 90].

After the January 23, 2020 visit, the audiologist recommended Patterson be provided hearing aids but noted his left ear was "worse than [his] right," and prescribed a nasal steroid and an annual hearing test. [Id. at 85, 86]. The January 13, 2020 record indicates a similar recommendation that Patterson be given a hearing aid for his left ear and that hearing aids were recommended in addition to an annual hearing examination. [Id. at 91, 92].

Patterson wrote a grievance dated January 30, 2020 regarding the recommendation that he be given hearing aids, requesting to know when he would get them. The grievance was received on February 4, 2020 and transmitted to Jacobs on February 5, 2020. [Dkt. No. 37-16 at 23]. Jacobs responded that Patterson would not be provided with hearing aids "because the note stated that it could not be determined if the problem was a result of trauma." [Id. at 24]. Patterson appealed and Bower responded on February 12, 2020, stating that he had spoken with Jacobs, who had spoken to Dr. Taylor, and that they would follow the doctor's order declining to provide the hearing aids. [Id. at 25].

Bower is not a medical professional and is not a medical provider at WTRJ or involved in the medical care of inmates. Bower does not make decisions regarding the diagnosis or treatment of inmate medical needs and is not responsible for scheduling or approving outside

medical referrals. Bower is not responsible for ordering prescription medications or administering them to inmates and relies upon the professional judgment of health care providers at WTRJ. [Dkt. No. 37-1 at 1-2]. WTRJ inmates may request medical treatment by filling out a Medical Request, but Bower does not review or respond to medical requests, as he is not a medical provider. [Id. at 2]. Bower has no knowledge of the medical requests Patterson submitted to the medical department. If Bower receives a grievance regarding an inmate's medical care, he forwards it to the medical department to act upon. If an inmate appeals a grievance determination, Bower reviews and investigates the grievance. [Id. at 3-4]. Bower had no knowledge of or involvement in Dr. Taylor's treatment of Patterson's hearing complaints, in Dr. Taylor's referral of Patterson to an audiologist, or in the prescription of a steroid inhaler for Patterson. [Id.].

Jacobs does not make decisions regarding diagnosis or treatment of inmate medical needs. As the Health Services Administrator, Jacobs' duties include acting as the records custodian for the WTRJ medical department, ensuring policies and procedures in the medical department are followed, assisting in answering health request forms, and placing patients on a list for follow-up care with the doctor. Jacobs is not a medical provider[3] and relies upon the professional judgment of health care providers at WTRJ. [Dkt. No. 37-6 at 1].

---

[3] Patterson asserts in his reply to the motion for summary judgment that Jacobs is a registered nurse and therefore is a medical provider but offers no proof in support of this assertion. [Dkt. No. 39 at 5]. In his reply, Patterson alleges that Jacobs dispensed medications to Patterson and other inmates in September 2020, which he asserts is proof that she is a "Medical provider." [Dkt. No. 42 at 1-2]. Patterson requests a subpoena be issued for Jacobs job description, which he states will prove that Jacobs is a medical provider. As addressed infra at pages 13-15, Patterson provides no evidence to refute either Jacobs or Bower's affidavits, which state that each relied on Dr. Taylor's determination that Patterson would not be provided hearing aids in denying his grievance and that neither official diagnoses inmates. Accordingly, no discovery is necessary to resolve this claim.

Dr. Taylor is the doctor at WTRJ. An inmate who seeks medical treatment can submit a medical request. Dr. Taylor triages his patient list and decides who to see and in what order. Jacobs does not make decisions regarding the order in which Dr. Taylor sees patients. Dr. Taylor is responsible for deciding if an inmate should be referred to an outside specialist and Jacobs is not involved in those decisions. [Id. at 2].

On or about February 4 or 5, 2020, Bower and Jacobs were made aware that Patterson had submitted a grievance regarding receiving a hearing aid and a nasal inhaler. The grievance was forwarded to the Medical Department for review and response. [Dkt. Nos. 37-1 at 3; 37-6 at 3]. Jacobs spoke with Dr. Taylor regarding Patterson's request for a hearing aid.

> Dr. Taylor had reviewed Patterson's records, including those from the audiologist. The audiologist had noted that while the March 2019 fight "cannot be ruled out as a contributing factor . . . patient does admit to history of recreational and occupational noise exposure which can also be contributing factors to his hearing loss, especially with the left worse than right." The audiologist also noted that Patterson could participate well in conversation and had clear speech.

[Id. at 3].[4] Jacobs was not involved in Dr. Taylor's decision to deny Patterson the recommended hearing aids. Relying on the doctor's medical judgment, Jacobs denied Patterson's grievance. [Id.].

On or about February 11, 2020, Bower received a grievance appeal from Patterson, seeking review of Dr. Taylor's denial of the recommended hearing aids. Bower spoke with Jacobs and learned that Dr. Taylor had reviewed Patterson's medical records and determined that the facility would not provide free hearing aids to Patterson, as his hearing loss could not be determined to be a result of trauma at the facility. Relying on the doctor's medical judgment,

---

[4] Patterson also complained about not receiving the inhaler that the audiologist had proscribed but admitted in his amended complaint that he received nasal inhalers on February 6, 2020. [Dkt. No. 10 at 13].

Bower denied Patterson's grievance appeal. Bower was not involved in the decision by Dr. Taylor to deny Patterson hearing aids. [Dkt. No. 37-1 at 3].

### B. Claim Two: Failure to Protect Claim

On January 20, 2019, Patterson was transferred to WTRJ. When he met with Bower, he expressed concerns for his safety to Bower because he had testified for the government in a murder case against a defendant (Wesley Hadsell) with ties to the Aryan Brotherhood [Dkt. No. 10 at 6, 7, 8], who had been at WTRJ. Bower advised Patterson that the inmate he testified against had been transferred and Patterson was assigned to Unit B5. [Dkt. 10 at 7].

On February 4, 2019, Patterson messaged Bower stating he had concerns for his safety because the other inmates in Unit B5 knew he was a "snitch." [Id. at 8]. Bower replied that Patterson would remain in Unit B5, but, roughly one week later, Patterson was moved from Unit B5 to Unit D2. Soon after his transfer, the inmates in Unit D2 learned Patterson had cooperated with law enforcement in the past, and an inmate from Unit D1, Gary Reevis (who Patterson alleges is a member of the Aryan Brotherhood), began sending Patterson threatening notes that also threatened Patterson's wife and family.[5] Patterson sent messages regarding Reevis's threats to WTRJ's PREA[6] and Classification units on February 17 and 21, 2019. [Id. 8, 9]. Patterson filed a statement with WTRJ on February 22, 2019, regarding Reevis and stated that he did "not feel that [his] safety was in jeopardy, as [Reevis] is listed as an enemy to me and will not return." [Id. at 61] (emphasis in original).

---

[5] Patterson requested to be separated from Reevis on February 13, 2019, stating that he had been helping the ATF in a case against Reevis. On February 16, 2019, Patterson requested that Reevis be placed on his enemy list. [Dkt. No. 37-4 at 56; 37-4 at 62].

[6] PREA is an acronym that refers to the Prison Rape Elimination Act. The goal of PREA is to eradicate prisoner rape in all types of correctional facilities in this country. Bureau of Prisons, Rape Elimination Act (PREA), https://bja.ojp.gov/program/prison-rape-elimination-act-prea/overview (last viewed Nov. 23, 2020).

On February 23, 2019, Patterson requested to be transferred to Unit E8 (protective custody) because of safety concerns generated by his assisting in the prosecution of two inmates by federal authorities. [Dkt. No. 37-4 at 59, Dkt. No. 10 at 11]. Patterson sent a message regarding Reevis's threats on March 5, 2019 to Bower. Sometime after March 5, 2019, at his request, Patterson was transferred to Unit E8. [Dkt. No. 37-1 at 2; Dkt. No. 10 at 11].[7] "Unbeknownst" to Patterson, Shane Cottrell, who Patterson alleges was a member of the Aryan Brotherhood, was then housed in the same unit. [Dkt. 10 at 11].

On March 10, 2019, Cottrell and Patterson were observed in a physical fight. Patterson wrote an inmate statement, stating that the fight was due to Cottrell's anger over Patterson being given an extra lunch tray. [Dkt. No. 37-7 at 5]. Both inmates were taken to the medical department and written up for rule violations. Patterson had superficial cuts to his face, as well as a dislocated finger and was transported to the Emergency Room for further treatment. Cottrell was not on Patterson's enemy list at the time of the altercation [Dkt. No. 37-1 at 2],[8] and Patterson had no reason to suspect Cottrell would assault him, stating in his amended complaint that he did not learn of the reason Cottrell might be a danger to him until after the assault. [Dkt. No. 10 at 11].

---

[7] In one of his replies to the motion for summary judgment, Patterson alleges he requested to be placed in protective custody on March 1, 2019 and was "locked down in DA" until March 10, 2019 when he was moved to Unit E8. [Dkt. No. 42 at 2]. This dispute of fact is irrelevant to the resolution of the motion for summary judgment on Claim Two, failure to protect.

[8] In a reply, Patterson asserts he was attacked on March 11, 2019. [Dkt. No. 42 at 2]. The incident reports, including Patterson's own statement, indicate the assault took place on March 10, 2019. [Dkt. No. 37-7 at 1-11]. The amended complaint also alleges the assault took place on March 10, 2019. [Dkt. No. 5 at 3]. For purposes of the Motion for summary judgment, the Court will use the March 10, 2019 date. Patterson requested that Cottrell be placed on his enemies list on March 15, 2019. [Dkt. No. 37-4 at 52].

Bower did not tell any inmates that Patterson was an informant, did not encourage assaults against him, never threatened Patterson, never retaliated against Patterson, did not deliberately place him in danger, or know that Cottrell posed any danger to Patterson. [Dkt. No. 37-1 at 2].

## II. Standard of Review

It is well settled that a motion for summary judgment should be granted only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). The burden is on the moving party to establish that there are no genuine issues of material fact in dispute and that it is entitled to judgment as a matter of law. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986).

Where, as in this case, the nonmoving party has the burden of proof at trial, the moving party need only demonstrate that there is a lack of evidence to support the non-movant's claim. See Celotex, 477 U.S. at 323-25. In response to such a showing, the party opposing summary judgment must go beyond the pleadings and proffer evidence that establishes each of the challenged elements of the case, demonstrating that genuine issues of material fact do exist that must be resolved at trial. See id. at 324; Anderson, 477 U.S. at 248. The party who bears the burden of proving a particular element of a claim must "designate 'specific facts showing there is a genuine issue for trial'" with respect to that element. Celotex, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(e)).

In reviewing the record on summary judgment, the Court "must draw any inferences in the light most favorable to the non-movant" and "determine whether the record taken as a whole could lead a reasonable trier of fact to find for the non-movant." Brock v. Entre Computer Ctrs., Inc., 933 F.2d 1253, 1259 (4th Cir. 1991) (citations omitted). "[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Anderson, 477 U.S. at 249.

The non-moving party, however, must show more than some metaphysical doubt as to the material facts. "[T]he non-moving party 'may not rest upon mere allegation or denials of his pleading but must set forth specific facts showing that there is a genuine issue for trial.'" Hughes v. Bedsole, 48 F.3d 1376, 1381 (4th Cir. 1995) (quoting Anderson, 477 U.S. at 256). Conclusory allegations, unsubstantiated assertions, improbable inferences, unsupported speculation, or only a scintilla of evidence will not carry this burden. See Anderson, 477 U.S. at 249-50. There must be evidence on which the jury could reasonably find for the non-moving party. Id. at 252. The judge's inquiry, therefore, unavoidably asks whether reasonable jurors could find by a preponderance of the evidence that the opposing party is entitled to a verdict.

When a defendant moves for summary judgment on the ground that plaintiff lacks evidence as to an essential element of his claim, plaintiff is required to present evidence of evidentiary quality (either admissible documents or attested testimony, such as that found in depositions or in affidavits) demonstrating existence of genuine issue of material fact; evidence need not be in admissible form, but it must be admissible in content, in sense that change in form but not in content, would make evidence admissible at trial. See Celotex, 477 U.S. at 324

### III. Analysis

Defendants Jacobs and Bower have moved for entry of summary judgment in their favor on Patterson's first claim, asserting that there is no genuine issue of material fact, and that Patterson has failed to produce evidence that the defendants were deliberately indifferent to his serious medical needs in violation of his Eighth Amendment right. Defendant Bower has also moved for summary judgment, asserting that there is no genuine issue of material fact, with respect to Patterson's second claim—that Bower failed to protect him while in WTRJ's custody, which resulted in an assault by another inmate on March 11, 2019.

#### A. Hearing Aids

In his amended complaint, Patterson alleges that he requested hearing aids after the audiologist recommended them and filed a grievance when prison officials failed to provide them. Jacobs replied to his grievance, stating that the hearing aids would not be provided because it could not be determined if Patterson's hearing issues were the result of being attacked at WTRJ. In the appeal, Bower replied that the hearing aids were not being provided because of the decision of the institution's doctor.

To prevail as to this claim, Patterson must submit evidence that, objectively, he was suffering from a serious medical need and that, subjectively, the defendants were deliberately indifferent to that need, meaning that they were aware of the need for medical attention but failed to either provide it or ensure the needed care was available. See Farmer v. Brennan, 511 U.S. 825, 837 (1994). Objectively, Patterson's medical condition must be "serious." See Hudson v. McMillian, 503 U.S. 1, 9 (1992) (finding no expectation that prisoners will be provided with

"unqualified access to health care").[9]  For purposes of this motion, the Court will assume that the hearing loss found by the audiologist is a serious medical need.

To establish a claim for denial of medical care against non-medical personnel, including nurses following a doctor's order, Patterson must show that the non-medical personnel or nurse failed to promptly provide needed medical treatment, deliberately interfered with prison doctors' treatment, or tacitly authorized or were indifferent to the prison physicians' misconduct.  Miltier v. Beorn, 896 F.2d 848, 850 (4th Cir. 1990).  Prison officials are entitled to rely on the opinions, judgment, and expertise of medical personnel.  Shakka v. Smith, 71 F.3d 162, 167 (4th Cir. 1995); Miltier, 896 F.2d at 854.  It is not the function of prison administrators or nurses to second guess the good faith treatment decisions of licensed physicians.  Shakka, 71 F.3d at 167; see Meloy v. Bachmeier, 302 F.3d 845, 849 (8th Cir. 2002) (a nurse administrator could rely on opinion of a prison doctor about the treatment that was deemed necessary for a prisoner).  The administrators themselves "cannot be liable for the medical staff's diagnostic decisions" and, indeed, "cannot substitute their judgment for a medical professional's prescription."  Meloy, 302 F.3d at 849; see also Arnett v. Webster, 658 F.3d 742, 755 (7th Cir. 2011) ("Non-medical defendants . . . can rely on the expertise of medical personnel.  We have previously stated that if

---

[9] The medical records establish that Patterson "could participate well in conversation and had clear speech" [Dkt. No. 37-6 at 3], and the audiologists January 13, 2020 notes indicate Patterson had "[n]o impairment in communication." [Dkt. No. 37-8 at 84, 90].  To be sure, even the audiologists records state only that hearing aids were *recommended*.  When Dr. Taylor examined Patterson on April 4, 2019, he found Patterson was able to hear from both sides at a conversational tone with no difficulties."  [Id. at 8]; see also, supra at 4-5.  A serious medical need is "one that has been diagnosed by a physician as *mandating* treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention."  Iko v. Shreve, 535 F.3d 225, 241 (4th Cir. 2008) (emphasis added).

13

a prisoner is under the care of medical experts, a non-medical prison official will generally be justified in believing that the prisoner is in capable hands.").

Moreover, a plaintiff is not entitled, under the Constitution, to the "treatment, diagnosis, and placement that he might desire." Price v. Dixon, 961 F. Supp. 894, 899 (E.D. N.C. 1997) (citing Wright, 766 F.2d at 849). In the Eighth Amendment context, the Supreme Court has recognized that "unqualified access to health care" is not required, Hudson, 503 U.S. at 9, nor is access to the "best and most expensive form of treatment," Taylor v. Barnett, 105 F. Supp. 2d 483, 489 n.2 (E.D. Va. 2000). In addition, an official's inadvertent failure to provide appropriate medical care, or an inmate's mere disagreement with a doctor's medical judgment do not constitute deliberate indifference. Wright, 766 F.2d at 849.

Here, it is undisputed that neither Bower nor Jacobs is a physician. As such, they were entitled to rely on Dr. Taylor's medical judgment, the medical professional charged with treatment of Patterson's hearing complaints, as to whether Patterson would be provided with hearing aids. See Camberos v. Branstad, 73 F.3d 174, 177 (8th Cir. 1995) (no deliberate indifference where prison nurses lacked authority to refer inmate to an outside physician but acted within the scope of their authority to assist him). Patterson has put forth no evidence to counter either Bower's or Jacobs' affidavits that deny either has the ability to diagnose Patterson's hearing loss or authorize the provision of hearing aids. See, e.g., Chamberlain v. Clarke, No. 7:14-cv-00013, 2014 U.S. Dist. LEXIS 70355, *9 (W.D. Va. May 22, 2014) ("an inmate cannot prevail on a deliberate indifference to medical needs claim against non-medical prison personnel unless they were personally involved with a denial of treatment, deliberately interfered with a prison doctor's treatment, or tacitly authorized or were deliberately indifferent to a prison doctor's misconduct" and his "dissatisfaction with their responses to his grievances is

a non-starter") (citing Miltier, 896 F.2d at 854-55; Lewis v. Angelone, 926 F. Supp. 69, 73

(W.D. Va. 1996)); see also Land v. Clarke, No. 7:12-cv-00354, 2012 U.S. Dist. LEXIS 147674

(W.D. Va. Oct. 15, 2012) (a supervisory official's response to a grievance alone is not sufficient

to establish the supervisor's deliberate indifference to a subordinate's unlawful act or

omission."); Chacon v. Ofogh, No. 7:08cv00046, 2008 U.S. Dist. LEXIS 68350, at *12 (W.D.

Va. Aug. 21, 2008) (assistant warden and health services director not deliberately indifferent for

denying grievances requesting free hearing aids after doctor made medical judgment; and a nurse

cannot "*overrule a doctor's order*" denying an inmate free hearing aids) (emphasis added),

adopted by, 2008 U.S. Dist. LEXIS 68348 (W.D. Va. Sept. 8, 2008).[10] Patterson has also not

shown that either defendant in any way hindered or delayed his appointments with Dr. Taylor,

who was the person with the authority to refer Patterson to a specialist and the only person who

could approve the provision of hearing aids.

Patterson has provided no evidence that either Bower or Jacobs had the authority to

authorize the provision of hearing aids. Patterson has also provided no evidence that it was Dr.

Taylor's decision that Patterson would not be provided hearing aids, which was why his

grievance and subsequent appeal were denied. In short, it was Dr. Taylor who denied the

recommended hearing aids and not Bower or Jacobs. See Mann v. Taser Int'l, Inc., 588 F.3d

---

[10] Several courts have recognized that a nurse cannot overrule a doctor's order. See Shover v. Chestnut, No. 7:18-cv-00202, 2019 U.S. Dist. LEXIS 88125, *24 (W.D. Va. May 24, 2019) (Nurse Chestnut was "entitled to rely on" on P.A. "Munsey's decision to deny Shover's request for a cane"), aff'd, 798 Fed. Appx. 760 (4th Cir. 2020); Rodriguez v. Lee, No. 7:12-cv-00268, 2013 U.S. Dist. LEXIS 79087, *10 (W.D. Va. June 5, 2013) ("Once Dr. Quiñones determined that the tinted eyeglasses were not medically necessary, Nurse Riley could not overrule the doctor's order."); Barnes v. Young, No. 7:12-cv-00067, 2013 U.S. Dist. LEXIS 131471, *12 (W.D. Va. Sept. 13, 2013) ("[O]nce Dr. Hopkins determined that the wheelchair was not medically necessary, Nurse Yates could not overrule the doctor's order, and she was entitled to rely on the doctor's prescribed course of treatment."); Melton v. Simmons, No. 1:08CV458-03-MU, 2010 U.S. Dist. LEXIS 3341, *16 (W.D. N.C. Jan. 13, 2010) ("It is inconsequential that" inmate asked the nurse "for orthopedic shoes" because "the physician in charge had already rejected the same request.").

1291, 1306-07 (11th Cir. 2009) (in addition to alleging a defendant's deliberate indifference to his medical needs, plaintiff must also prove causation between that indifference and his injuries); Evans v. Chalmers, 703 F.3d 636, 647 (4th Cir. 2012) ("constitutional torts … require a demonstration of both but-for and proximate causation" and "intervening acts of other[s]" may "insulate" a defendant from liability). Indeed, both Bower and Jacobs were no more than the bearers of the bad news. See Meloy, 302 F.3d at 849 (holding that a prison medical director could not be held liable for refusing to override a prison doctor's decision that an inmate did not need a CPAP machine, and stating: "Prison officials cannot substitute their judgment for a medical professional's prescription."); Keeper v. King, 130 F.3d 1309, 1314 (8th Cir. 1997) (holding that a prison official who lacked medical expertise, and who was not involved in treatment decisions made by medical staff, "cannot be liable for the medical staff's diagnostic decisions").

Patterson attempts to prove his case by informing the Court by letter that after he was transferred to the Hampton Roads Regional Jail ("HRRJ") on September 4, 2020 [Dkt. No. 33], he was provided hearing aids on October 27, 2020 by HRRJ. [Dkt. No. 41].[11]  At best, Patterson simply establishes a difference of opinions between doctors, and he has not sued Dr. Taylor. See, e.g., Norfleet v. Webster, 439 F.3d 392, 396 (7th Cir. 2006) (finding that a mere difference of opinion between doctors is insufficient to show deliberate indifference); Wilhelm v. Rotman, 680 F.3d 1113, 1122-23 (9th Cir. 2012) (physician who comes to different diagnosis not

---

[11] Patterson also states HRRJ ordered him glasses, which is irrelevant because he did not include a claim regarding glasses in his amended complaint. See Fawzy v. Wauquiez Boats SNC, 873 F.3d 451, 455 (4th Cir. 2017) ("a properly filed amended complaint supersedes the original one and becomes the operative complaint in the case, it renders the original complaint 'of no effect.'") (quoting Young v. City of Mt. Ranier, 238 F.3d 567, 573 (4th Cir. 2001)); Rhodes v. Robinson, 621 F.3d 1002, 1005 (9th Cir. 2010) (as a general rule an amended complaint supersedes "the original, the latter being treated thereafter as non-existent.") (citation omitted).

deliberately indifferent to plaintiff). Even assuming Patterson had sued Dr. Taylor and had

questioned the propriety of Dr. Taylor's course of treatment, the deliberate indifference standard

"is not satisfied by . . . mere disagreement concerning '[q]uestions of medical judgment,'"

Germain v. Shearin, 531 F. App'x 392, 395 (4th Cir. 2013) (quoting Russell v. Sheffer, 528 F.2d

318, 319 (4th Cir. 1975)), or mere negligence in diagnosis or treatment.  See Webb v.

Hamidullah, 281 F. App'x 159, 166 (4th Cir. 2008) ("Put simply, negligent medical diagnoses or

treatment, without more, do not constitute deliberate indifference."); Allard v. Baldwin, 779 F.3d

768, 772 (8th Cir. 2015) (while inmate "may have established a question of material fact

sufficient for a negligent malpractice case, such evidence does not show deliberate

indifference.").[12]

Because Patterson provides no evidence that Jacobs or Bower had reason to believe he

was not receiving adequate medical care, the denial of Patterson's grievance cannot serve as a

basis for a deliberate-indifference claim.  Accordingly, Jacobs' and Bower's motion for summary

judgment on Claim One will be granted.

*B. Failure to Protect*

Patterson's second claim alleges Bower failed to protect him from harm while he was in

custody at WTRJ.  To establish that the risk of exposure to future harm violates the Eighth

Amendment, the risk must be "sure or very likely to cause serious illness and needless suffering"

---

[12] As noted, see supra at note 9, Dr. Taylor's ability to communicate in normal conversational
tone with Patterson as well as the audiologist's notes that Patterson had no "impairment in
communication" provides a medical basis for not approving the *recommended* hearing aids.  See
Gilmore v. Hodges, 738 F.3d 266, 276-77 (11th Cir. 2013) ("if a plaintiff can 'carry on a normal
conversation' and hear and follow directions without the use of a hearing aid, a court would be
hard pressed to classify the plaintiff's impairment as a serious medical need.").

and give rise to "sufficiently imminent dangers." Helling v. McKinney, 509 U.S. 25, 33, 34-35
(1993). "[T]here must be a 'substantial risk of serious harm,' an 'objectively intolerable risk of
harm' that prevents prison officials from pleading that they were 'subjectively blameless for
purposes of the Eighth Amendment.'" Baze v. Rees, 553 U.S. 35, 50 (2008) (quoting Farmer,
511 U.S. at 842, 846, and 847 n.9)).

A prison official is not liable if he or she "knew the underlying facts but believed (albeit
unsoundly) that the risk to which the facts gave rise was insubstantial or nonexistent." Farmer,
511 U.S. at 844; see also Rich v. Bruce, 129 F.3d 336, 338 (4th Cir. 1997) (finding that a prison
official was not liable, because he did not actually draw the inference that the inmate was
exposed to a substantial risk of serious harm).  Whether a defendant was subjectively aware of
the risk of harm can be shown either through direct evidence or circumstantial evidence of actual
knowledge.

> 'Whether a prison official had the requisite knowledge of a substantial risk
> is a question of fact subject to demonstration in the usual ways, including
> inference from circumstantial evidence, and a factfinder may conclude that
> a prison official knew of a substantial risk from the very fact that a risk
> was obvious.' Farmer, 511 U.S. at 842 (citations omitted). 'In other
> words, although the obviousness of a particular injury is not conclusive of
> an official's awareness of the injury, an injury might be so obvious that the
> factfinder could conclude that the guard did know of it because he could
> not have failed to know of it.' Brice, 58 F.3d at 105 (citations omitted).

Makdessi v. Fields, 789 F.3d 126, 133 (4th Cir. 2015).

Here, the present record, in the light most favorable to Patterson, establishes that plaintiff
testified against a member of the Aryan Brotherhood (Hadsell), and that he had been threatened
by another inmate (Reevis, also a member of the Aryan Brotherhood) because he had testified
against Hadsell.  Patterson alleges Bower was aware of these facts, that Patterson was concerned

18

about his physical safety, that Patterson contacted Bower about being transferred to Unit E8 on March 5, 2019, and that Patterson was assaulted by a member of the Aryan Brotherhood (Cottrell) on March 10, 2019, which Patterson asserts in his response to the motion for summary judgment was the day he was transferred to Unit E8. [Dkt. No. 42 at 2]. A reasonable jury, on these facts, might conclude that Bower "could not have failed to know" that housing Patterson in Unit E8 with Cottrell, a member of the Aryan Brotherhood, would expose him to a likely assault.

Although Bower denies deliberately placing Patterson in danger, or that he knew Cottrell posed any danger to him, Bower did not address several points in his affidavit: Why was Patterson transferred in February and March of 2019; who was responsible for each of his transfers and why was Patterson transferred; did Bower/WTRJ know which inmates or detainees were members of the Aryan Brotherhood; were Hadsell, Reevis and Cottrell members of the Aryan Brotherhood; did Patterson ever express concern about being housed with members of the Aryan Brotherhood; and were Patterson and Cottrell previously housed together. Additionally, although Patterson asked to be transferred to Unit E8, it is not clear on the present record when Patterson was actually transferred—in short, how long were Cottrell and Patterson housed together before the assault. While Bower notes that Patterson stated at the time of the assault that the conflict was over an extra food tray, what Patterson stated is not as relevant as what Bower knew. As noted, there is too much unknown to grant summary judgment under the standard set forth in Makdessi.

Defendant asserts that, even if plaintiff's allegations were proven true and a constitutional violation did occur, he is entitled to qualified immunity because his actions did not violate "clearly established statutory or constitutional rights of which a reasonable person would have

known." [Dkt. No. 37 at 18-19] (citing Harlow v. Fitzgerald, 457 U.S. 800 (1982)). Because the precise bounds of defendant's actions have not yet been established, the Court will defer ruling on qualified immunity at this juncture. To the extent defendants wish to provide additional evidence with respect to this claim and renew this argument or their argument as to the merits of the claim in a renewed motion for summary judgment, he may do so.

## IV. Conflict of Interest

Patterson's attempt to disqualify the defendants' counsel on the basis that his mother once worked for defendants' law firm [Dkt. No. 38 at 1] is meritless. "The ... disqualification of a party's chosen counsel is a serious matter which cannot be based on imagined scenarios of conflict." Tessier v. Plastic Surgery Specialists, Inc., 731 F. Supp. 724, 729 (E.D. Va. 1990) (citations omitted). "Thus, the moving party bears a 'high standard of proof' to show that disqualification is warranted." Id. (citations omitted). In determining whether to grant a motion to disqualify a party's counsel, courts generally apply a two-part test.

> [T]he movant must establish both: (1) that an attorney-client relationship existed between the alleged former client, and (2) that the former representation and the current controversy are substantially related. Allegaert v. Perot, 565 F.2d 246, 250 (2d Cir. 1977) ("before the substantial relationship test is even implicated, it must be shown that the attorney was in a position where he could have received information which his former client might reasonably have assumed the attorney would withhold from his present client."); In re Chantilly Construction Corp., 39 B.R. 466, 469 (Bankr. E.D. Va. 1984). "Substantially related" has been defined to be "identical" or "essentially the same."

Tessier, 731 F. Supp. at 730. Patterson does not allege any prior privileged client relationship between himself and defendants' law firm and has not shown the defendants' attorneys had access to any confidential information,[13] that any such information was ever disclosed, or that his

---

[13] See Dana Corp. v. Blue Cross & Blue Shield Mutual, 900 F.2d 882, 889 (6th Cir. 1990) (in addition to a prior attorney-client relationship in substantially related matter, a party moving for

mother's prior employment was anything more than an unrelated collateral matter. See Clark v. Bank of New York, 801 F. Supp. 1182, 1198 (S.D.N.Y. 1992) (representation in unrelated transactions insufficient for disqualification of counsel). Further, the Court accepts counsels' representations, see Laskey Bros. of W. Va., Inc. v. Warner Bros. Pictures, 224 F.2d 824, 827 (2d Cir. 1955) (representations of counsel may rebut allegations of a conflict), and finds no factual basis for Patterson's allegations of a conflict.

## V. Conclusion

For the foregoing reasons, defendants' motion for summary judgment is granted with respect to Claim One and denied with respect to Claim Two. An appropriate order will issue alongside this memorandum opinion.

Entered this 24 day of November 2020.

Alexandria, Virginia

Anthony J. Trenga
United States District Judge

---

disqualification must establish that the attorney acquired confidential information from the party seeking disqualification).